CHARLES H. MARSHALL v. FREDERICK L. VULTEE and another. (a)

The cases found in the English reports, to the effect that a distress for wharfage can only be made upon the premises from which the rent accrues, have no application in this state; express power being given by statute, to distrain for wharfage on any goods or chattels on board of a vessel which has been for twenty four hours at a wharf in the city of New York.

*It seems*, that the grant of a right to wharfage conveys an interest in the lands from which the wharfage flows; and that a grant of land to a street, and bounded thereby, carries title to the centre of the street, although, at the time of the grant, the street may lie under water and not be filled up, but merely laid out and intended for a street.

The authority of the corporation of New York, to grant an interest, to private owners, in the building of a pier, is confined to grants to the owners of the lots opposite the place where the pier is to be sunk.

But where a pier was built by order of the common council, and the interest of the private owners of the lots opposite thereto was extended to and divided between all persons owning lots fronting on the block part of which was opposite to the location of the pier, who paid two thirds of the expense of construction—the corporation paying the other third of such expense—the arrangement being that they should receive one half of the wharfage, and the. corporation the other half; all of which was sanctioned by the common council, and acquiesced in by all parties for upwards of twenty years; *held*, that the corporation of New York cannot now set up that such persons are not legally vested with an interest in the pier. It is too late for either party to deny the title of the other.

Whether the corporation can build a pier in front of a public street, at their own expense, and take the wharfage thereon in the same manner as in cases where the upland is owned by them, and without the preliminary proceedings required in other cases; *quere?*

The power given by statute to the corporation to enlarge any of the slips in the city of New York, is a continuing power, applicable not only to the slips existing at the time the law was passed, but to all such slips as may from time to time be constructed.

Such laws, intended for the public convenience, and connected with the necessary regulation and regular supply of a rapidly growing city, should be liberally construed in favor of the public interests.

By the words, " enlarge any of the slips of the city," the law (2 R. L. of 1813, p. 435, § 230,) authorizes as well their extension into the river as their widening.

The notice required before extending a pier for the purpose of enlarging a slip, must

---

(a) This case was argued before INGRAHAM, FIRST J., and DALY, J.　WOODRUFF, J., did not participate in its decision.

be directed to the proprietor of the lots opposite to the pier; and unless the law is strictly complied with, the owner cannot be deprived of his rights by the corporation extending the pier at their own expense, and assuming to collect the whole of the wharfage thereon.

Where a notice was addressed to the proprietors of the pier instead of being directed to the proprietors of the lots, it was held insufficient.

The fact that the proceedings are contested by the owner, will not waive an omission of notice.

Where the notice provided for an extension of 72 feet, and the pier was then extended 90 feet; it was *held*, that there was not a strict compliance with the statute.

A distress by the lessee of a wharf or pier, for wharfage of premises, only a part of which premises belongs to him, is void.

THIS case has been tried three times. On the first trial the defendants recovered judgment, which was reversed by the supreme court, an appeal at that time lying from the common pleas to that court. The second trial resulted in a verdict for the plaintiff; but the cause was sent back to this court by the court of appeals, upon a technical error in the record, not involving the merits. Judgment was again obtained by the plaintiff, on the third trial, and the defendants appealed to the general term of this court.

The plaintiff sued the defendants under the old system of practice, in replevin, for taking certain furniture from the cabin of his ship, the England. The defendants pleaded *non cepit*, and a special avowry and cognizance, that the corporation of New York owned the pier No. 23 East river, and leased it to the defendant, Guion; that the plaintiff's ship lay to the said pier and owed wharfage, for which a warrant of distress was issued to his bailiff, Vultee, who executed it upon the property mentioned in the declaration. The plaintiff replied, denying the special property of the defendant, Guion, in the wharf or pier, as claimed in his avowry.

In 1804, the corporation, being the owners, under the Dongan and Montgomerie charters, of the tide way between high and low water mark, and four hundred feet beyond into the East river, granted to the executors of Crommelin, the water lot between Front and South streets, 50 feet in width on those streets, and 147 feet in depth. The condition of the

grant was, that the grantees should build the part of a wharf or street, 70 feet in breadth, to be called South street, in front of and contiguous to the south end of the lot, in consideration of which they were to have the wharfage which should accrue in front of the part of the said street or wharf to be built by them. The corporation simply passed their title and interest to the grantees, without any other covenant. A small alley, about 24 feet in width, called Crane Wharf street, afterwards included in Beekman street when Beekman street was opened to the river, was laid out, covering about 12 feet of the south part of this lot.

About one half of this part of South street is outside of the 400 feet beyond low water mark.

In 1819, Beekman street was extended to South street, and the whole of the 50 feet, granted to the executors of Crommelin, to the westerly or inner side of South street, was taken; but the plaintiff claims that by such taking, the right of the grantees, as owners of the wharf, or of the wharfage, on the outside of South street, was not interfered with.

There was no proof as to who made South street and built the bulkhead in this locality, whether the executors of Crommelin or the corporation.

In 1821, the pier in question was built, the corporation paying one third of the expense. The other two thirds were not paid alone by the owners of lots directly opposite the place where the pier was to be sunk, at the foot of Beekman street, but were divided between the proprietors of lots between Crane wharf street, (being the southwesterly line of Beekman street,) and Peck slip. The corporation were to receive one half of the wharfage. This contribution of expense and distribution of wharfage occasioned discontent, and one of the executors of Crommelin petitioned the corporation to be indemnified for the loss of bulkhead on the southerly side of South street, in consequence of the building of the pier, claiming payment, at the value of the wharfage, in the proportion that the distance between the centre of the pier and the western boundary of their grant, bore to 50 feet. A compromise ordinance was passed, whereby the wharfage on the easterly line of the pier, or on the end of it, was to be

divided among the owners of lots in front of which the pier was built, including as well the executors of Crommelin from the centre of the pier to the western line of their grant, as those owning from such centre line to the east, in proportion to their loss of bulkhead. This compromise was also based upon the idea, that all those persons were then interested in the wharfage of a slip formed by the Crane street wharf.

From 1821 to 1841, the corporation or their lessees received the wharfage on the southwesterly side, and claimed the right to lease or collect the wharfage on half of the end; but the collectors of the private owners collected the wharfage on the northeasterly side and the whole of the outer end.

In 1841 the corporation directed the extension of this pier 72 feet. Notice was published, in intended compliance with the 232d section of the act of 1813, and was directed to the proprietors of the easterly half of the pier, calling upon them to signify their election to contribute to the expense of the extension. The proprietors did not signify their election, and refused to join in the proposed extension. The corporation then extended the pier 90 feet, instead of 72, (the variance resulting from the necessity or convenience of construction,) and claimed the ownership of the whole. The private owners, who were the owners of lots fronting on South street opposite to this pier and between the same and the next one lying north, contested these proceedings, and still claimed, after the extension was made, the ownership of the northeasterly side of the pier and the whole of the end.

The corporation leased their interest and right to the wharfage of the pier to the defendant, Guion. The plaintiff's vessel lay, part of the time, on the northeasterly side and part of the time at the end of the pier. The plaintiff refusing to pay wharfage, Guion issued his warrant of distress to the bailiff, Vultee, who levied upon furniture on board the ship, for which this action of replevin was brought.

The court, at special term, held that the corporation was not the owner of the pier or extension, and that Guion was not entitled to the wharfage.

*Henry E. Davies*, for the defendants.

*Alexander H. Dana*, for the plaintiff.

By the Court.   Ingraham, First J.—This suit was brought before the passage of the code, and is an action of replevin, to recover for the taking of certain furniture from the ship England, belonging to the plaintiff, and lying at the end of pier No. 23, East river.

The defendants plead *non cepit*, with an avowry that the defendant Guion, as lessee of the owner, and the defendant, Vultee, as his bailiff, made distress upon the property in the declaration mentioned, for wharfage due to Guion from the plaintiff for the said ship.   The plaintiff takes issue upon the title of Guion to the wharf for which the wharfage is claimed. The action is brought to try the title of the corporation of the city of New York to the end of the pier, and their right to collect wharfage therefor.   The case was tried on the 9th day of June, 1851, before me, without a jury, and judgment was ordered for the plaintiff for six cents damages, and the value of the property assessed at $75.

Upon the trial, the taking and value of the property were admitted, and it was also admitted that the ship England was, during part of the time the wharfage accrued, at the easterly side, and part of the time at the end of the pier, and it was found upon the trial that the defendants were not the owners of the wharf in the pleadings mentioned.   The warrant of distress and proceedings under which the property was taken were also admitted; and no objection made to their regularity in point of form.

By the evidence, it is proven that the pier in controversy, now known as No. 23 East river, was originally constructed at the joint expense of the corporation and the proprietors of the ground lying between Crane wharf street and Peck slip.   This must have included the proprietors of the land which was taken for the opening and widening of Beekman street.

In sinking this pier, the corporation paid one third, and the

proprietors of the lots paid two thirds of the expense ; and by the resolution of the common council, the private owners became entitled to one half of the wharfage and slippage, both on the side and at the end of the pier.

This was divided, by the corporation taking the southwesterly side of the pier, (adjoining Fulton slip,) and the half of the outer end, and the private owners taking the northeasterly side and half of the outer end, and collecting the wharfage thereon.

Some time after the sinking of the pier, in the year 1840, a resolution was passed by the common council, directing the extension of several piers on the East river, including pier No. 23. This pier was directed to be extended not exceeding 72 feet, and the necessary legal measures were directed to be taken for that purpose.

This contemplated the usual notice to the private owners to unite in such extension, by paying two thirds of the expense, and becoming the owners of one half of the wharfage, as provided for when a slip was enlarged. In 1841, a resolution was passed, directing the street commissioner to extend the pier at the public expense, if the owners of the adjoining lands neglected to contribute their proportion of the expense according to law. The private owners having neglected or refused to unite in paying the expense, the pier was extended at the expense of the corporation, and they claim to be the owners of the addition so made, including the end of the new pier.

The private owners still claim that the extension of the pier did not deprive them of the wharfage on the easterly side and easterly half of the end of the pier, but that they are still entitled to collect the same.

An objection was made to the right of distress, upon the ground that a distress can only be made upon the premises from which the rent accrues ; and that it cannot be made on board of a vessel attached to a wharf for wharfage dues. Some cases to that effect were cited from the English books.

It is sufficient, however, to say, that those cases are not applicable in this state, because by 2 R. L. 1813, p. 429, sect.

217, " express power is given to distrain for wharfage, on any goods or chattels found on board the ship or vessel which has laid twenty four hours at any wharf in the city of New York."

It is contended that the reversal of the former judgment in this court by the court of appeals was not upon the merits, but by reason of a defect in the verdict; and that the judgment of the supreme court reversing the judgment of this court in this case, and a like judgment of affirmance of a decree in the late court of chancery, by the supreme court, settling the rights of the parties in the subject matter of this controversy, should be conclusive upon the court at the present time.

The views expressed by the supreme court in reversing the former decision in this case by this court, are similar to those entertained by the assistant vice chancellor, and are entitled to much weight with us in reviewing our former decision; and the more so, because when that decision was made by the court, there was much doubt entertained by the judges upon the question passed upon by them. As the decision of the supreme court is not, however, at this time, controlling upon this court, and as the questions have been fully re-argued upon the old case, with some additional testimony, we think it will be more proper for us to express our opinion upon them without considering either the former adjudication of this court, or the reversal of that judgment by the supreme court, as settling the question of law raised in the cause.

It can hardly be necessary to discuss the question whether the owners of the upland originally had any rights entitling them to participate in building pier No. 23, under resolution of 1821.

Prior to that time, they had, by grants from the corporation of New York, acquired title to lands extending to 377 feet, 7 inches below low water mark, and also the land between high and low water mark. Their title to the land was beyond dispute to that extent, both as riparian owners, if they had any rights as such, and as grantees of the corporation of New York, who held all the rights which the sovereign origi-

Marshall v. Vultee.

nally had, and all title to the land not owned by the riparian owners.

These conveyances extended their land to South street. By the conveyance which extended their land to South street, the grantees were bound to make and finish South street in front of their premises, of the width of seventy feet, and keep the same at all times in repair, to be used as a public street of the city.

In consideration thereof, the corporation thereby covenanted and agreed, that the grantees should forever thereafter have all wharfage, cranage, advantages and emoluments growing or accruing by or from the wharf or street fronting on the East river, opposite to the premises granted; and they then provided, that such clause should *not be considered as a covenant on the part of the corporation, but only so far as to pass the estate they had;* or, in other words, as a grant by them of their estate, right and interest in such wharfage, cranage, advantages, &c.

By these conveyances, a strip of land remained of 30 feet, not expressly granted by the corporation, on the westerly side of South street, and extending to the line run 400 feet below low water mark.

The defendants' counsel insisted, upon the argument, that the corporation having reserved this strip in South street, and not having parted with the fee thereof, are to be considered as the owners of the land immediately adjoining the river; and that, therefore, all rights claimed for the owner of the adjacent land are vested in them.

It may well be doubted whether the wording of this grant and of that clause in reference to the covenant for wharfage, &c., did not convey some rights in the portion of the street not included in the description of the premises in such conveyance.

In the Mayor, &c. v. Whitney, in court of appeals, Judge Strong, in his opinion, says: Wharfage, whether it be considered as a franchise conferred by the public on the riparian owner, or as his private property, resulting from his title, is an

interest in the lands, and the fee can be acquired originally only by a grant, or by prescription, which supposes a grant. If this be so, a grant of wharfage conveys an interest in the lands from which the wharfage flows. And the clause of the deed which declares the intent of the covenant to be, to carry the estate of the corporation therein, may add weight to that position. So by no means is it free from doubt, whether the land contained in South street, to the centre of the street, did not pass by a grant of land to the street, and bounded by the street. Such has often been held to carry title to the centre of the street; and there can be no difference in the effect of the rule, whether that street has been filled up or not, so long as it was laid out and intended for a public street.

If so, then the whole argument of the defendants' counsel, based upon the supposed title of the corporation to South street, must fail, because no title is claimed to the land below the line of 400 feet from low water mark, the only right of the corporation beyond that line being a privilege to erect wharves, or to grant such privilege, with the rights to wharfage, &c., connected therewith. The corporation, by their acts throughout all the period of time from the first grant until the extension of this pier, have recognized the rights of the owners of the upland; and when the pier was erected in 1821, they recognized these rights as appertaining to the owners of the bulk-head in South street, and of the lots adjoining, on the westerly side of South street, as one and the same. This is apparent from the resolutions of May, 1813, March, 1816, and from the reports and resolutions of the finance committee, adopted by the common council in 1821 and 1822. By these proceedings it was admitted that the pier was to be erected in front of private property, and that the owners were entitled to participate in the expense of building, and to receive their share of the wharfage and slippage as indemnity therefor. If the question were now raised, in regard to the regularity of the proceedings by which the owners of the lots between Crane wharf and Peck slip were called upon to contribute to the building of this pier, and their right to participate in the wharfage contested, that

right could not be sustained under the statute. The persons entitled to this right were the owners of the lots opposite to the place where the pier was to be sunk, whether the corporation or private owners; and it was only after a neglect or refusal on their part (if owned by individuals) to comply with the resolution of the common council, that the corporation became authorized to do it at their own expense. But where the object was the enlargement of a slip—which is the only case in which the payment of one third is provided for by the corporation, to give them an interest in the pier—there is no provision by which the corporation could grant such an interest to other proprietors of lots, except those opposite to the pier.

In this case, however, the petitioners for the pier probably agreed to this mode of its erection. No objection was made to the proposed division among the proprietors, and they paid their respective portions for the pier.

Their title to it ought not, in this collateral way, to be impeached; but, on the contrary, the pier having thus been built and paid for by the owners of the upland in 1821, under the resolution of the common council, and their right to one half of this pier having been acknowledged and acquiesced in by all parties since that time, there is thus presented a state of facts which should be considered as giving those persons sufficient title at least to prevent the common council from setting up at this time, that such owners are not legally entitled to the same; and also to prevent such proprietors from denying the title of the corporation as it existed previous to such grants to them.

This brings us to the examination of the question, whether or not the common council had a right to order the extension of this pier in 1841; and if so, upon what conditions such extension should take place. The authority for such extension can only be found in the statutes passed by the legislature.

The power to erect wharves and piers, granted by the Montgomerie charter, p. 87, (Kent's ed.) only allowed the building of such wharves within the limits of the 400 feet granted below low water mark.

Marshall v. Vultee.

The plaintiff's counsel insisted that such power was improperly exercised in the first instance, in building the pier in 1821; because the same was built in front of private property, viz., the bulkhead on South street, and that it therefore belonged to private owners, and the corporation had no right to an interest therein.

It has already been remarked, that after payment of a proportion of the costs of building, after a division of the wharfage, and acquiescence therein since 1821, it is now too late for the parties to such an arrangement to deny the title of either party. If the objection had originally been made to the authority of the common council to direct the building of the pier, in the manner adopted by them, such objection would have probably led to a more clear expression of their objects, and of the authority under which they were acting.

By the statute it is provided, that when a pier is to be erected, the proper course is to notify the owners to build and sink the pier within a time to be limited by the common council; and if the owners of the lots opposite to the place where the pier is to be sunk, neglect or refuse to comply with such directions, then the corporation may sink such pier at their own expense, and take the wharfage, or may grant such right to others. (Sec. 224.)

Or the corporation may erect such pier for themselves, if they deem it necessary in laying out wharves and slips; but for that purpose they must take the land of private owners and pay the value therefor. (Sec. 219.)

And where the corporation is the owner of the upland opposite to the place where the pier is to be built, there can be no doubt but that they would have authority to build a pier at their own expense, and take the wharfage thereon, without resorting to the preliminary proceedings required in other cases.

How far the corporation could exercise this power in front of a public street, it is not necessary now to inquire. The decision of that question involves an examination of other rights, which is foreign to the merits of this controversy. It is not pretended that the pier was erected in this mode; and whether

Marshall v. Vultee.

the former owners of the land taken for a public street retain any interest therein, or whether such interest is vested in the owners of the land bounded on the new street when opened, or in the corporation, are questions which may well lead to much discussion. Although they were, to some extent, argued on this appeal, we do not think it necessary to decide them in the disposition of this case.

The course which was adopted in building this pier was not authorized by any provision of the statute, except that one which provides for the enlargement of a slip, (secs. 230, 231 and 232,) and even for such a purpose the notice did not comply with the requisites of the statute, nor can this work be considered as originally an enlargement of a slip.

I am rather inclined to look at this proceeding as one of mutual compromise and agreement between the parties interested, by which they all finally agreed to an arrangement, not in strict conformity to law, but which was most for the interest of all. At any rate, we should hold all the parties, (as has been repeatedly said in former opinions on these questions,) to the necessary consequences of their acts, viz., the erection of a pier and the establishment of a public slip.

Although, for such a purpose, it would have been more proper that the expense of the pier should have been borne by the corporation; yet, if the owners of adjoining lots saw fit, from any motive, to accept a proposition made to them by the common council, to pay two thirds, and have a share in the wharfage, it is now too late for them to object; and I can see no reason why this is not now to be considered one of the public slips in the city.

Was the enlargement of this slip, then, conducted in a mode consistent with the provision of law?

The 230th section of the act above referred to, allows the Mayor, &c., in all cases, when they think it for the public good, to enlarge any of the slips in the city, and provides, that on paying one third of the expense of building the necessary piers and bridges, they shall be entitled to half of the wharfage, &c.

It is objected that this only referred to the slips then existing in the city of New York, but, as I think, without any reason therefor. It is averred in the section itself, to be a measure depending on its being necessary for the public good. This provision is contained in a statute purporting to provide the necessary powers for the government and regulation of the city, and which evidently looked forward to its future growth and rapid increase. Under such circumstances, to construe provisions regulating the building and enlarging the wharves, piers and slips, as sections limiting the power of the common council to those then existing, would be adopting a limited mode of construction, to which I could not assent, and which would be in direct opposition to the whole scope and intent of the statute. On the contrary, the power there granted is a continuing power, applicable not only to the slips existing at the time of the passage of the act, but to all such slips as may from time to time be constructed for the welfare of the city. Such acts, intended for the public convenience, and connected with the necessary regulation and regular supply of the wants of a rapidly growing city, are entitled to a liberal construction in favor of the public interest. In the language of Judge Bronson, "the authority is in its nature a continuing power, or one which does not cease the moment it is once executed." It was given for the purpose of promoting the public convenience, although the power should never be exercised capriciously, or upon light considerations. (17 Wend. 667.)

By the term "*enlarge any of the slips in the city*," is doubtlessly intended as well their extension into the river, as their widening. The former mode, rather than the latter, was contemplated. The gradual filling up of the slips, from accumulation of filth within them, and the growth of the city around them, would naturally lead to their enlargement by extension into the river, in preference to widening them, and thereby involving the necessity of taking up and removing, at great expense and difficulty, piers theretofore erected.

The provisions of the statute which gave to the corporation the right, when they enlarge a slip, to take the slippage on the

side adjoining the slip enlarged, and half of the wharfage at the outermost end of the pier, I have already referred to. (Sect. 230, 2d R. S. 431.)

The 231st section of that act provides, that in case any of the proprietors of lots opposite to the places where piers shall have been or may be directed to be sunk, &c., shall neglect or refuse to do so, the corporation may join in doing so, and become entitled to their share of the wharfage, &c.

And the 232d section prescribes the notice requisite in such cases, to be a notice published in the newspapers, and to *be directed to the proprietor* of the lots opposite to the place where the pier is to be sunk, without specifying the names of the proprietors.

The notice given to the owners or proprietors in this case did not pursue the words of the statute. Instead of being directed to the proprietors of the lots, it was directed to the proprietors of the easterly half of pier No. 23. It was only on condition of complying with the provision of the 232d section that the corporation could obtain any right to the wharfage on the easterly side of the pier, even in the first instance. It cannot, with any propriety, be maintained that they could obtain such right to the extended portion, and thereby deprive the owners of the first pier of the right they had acquired and paid for, except by a strict adherence to the provisions of law, which would deprive them of such rights.

The notice was addressed to a different class of persons. Those who owned the pier as originally built, were the owners of the lots between Crane wharf street and Peck slip. Those to whom it should have been directed were the proprietors of lots opposite to the place where the pier was to have been sunk.

It can hardly be said that the owner of a lot adjoining Peck slip is the owner of a lot opposite to the place where the pier was ordered to be sunk. If the persons to whom the notice was directed had, in compliance with the notice, entered into the arrangement, and paid a proportion of the expense, as was done in the first instance, it would require something more than

a mere notice of this kind to sustain their right to the extended pier. I have already referred to the rights of these owners, and so far as any question is raised in this case on that point, have held that payment, and the long acquiescence in their possession, was sufficient to prevent the corporation from now denying their title. The objection, as made to this notice, is different, and I think fatal to its validity. It was not addressed to those pointed out in the statute, and the persons really entitled to it could not, under that notice, be. protected in their rights. It is said, however, there were no such persons; that the land belonging to the estate of Crommelin, which was the land opposite to the place where the pier was directed to be sunk, had been taken by the corporation for the widening and opening of Beekman street, and that there was no person who owned any lot opposite thereto. Admitting this to be the effect of that proceeding, there remained no mode by which the rights of the owners of the piers, as originally constructed, could be interfered with. The common council had a right to order the slip to be enlarged; they had a right to call upon the owners of the lots to extend the pier for that purpose; and it may be, that in case of its not being so extended, they had the right to build the extension at their own expense. But still the difficulty remains, that there was no other way to deprive the owners of the former piers of their right to the wharfage at the end of the pier, or to vest in themselves any right to wharfage beyond what they would have been entitled to if there had been owners of lots to unite with them in the extension. It was urged, however, upon the argument, that the acts of the parties relieved the corporation from giving the notice, if it be considered that the notice was insufficient, that the appearance and letter of Mr. Stevens admitted notice. It is said in the case, that Stevens attended on behalf of the proprietors; but in his letter he only professes to act for himself and others of his family. This surely could not bind other proprietors. If he had acted generally for all, it might be very questionable whether that would be sufficient. The cases cited by the defendants' counsel (7 Barb. S. C. 498; 5 Cow. 506; 3

J. C. 243; 2 Wash. C. C. R. 142) do not warrant so extended an application of the rule. The statement of those on whose behalf opposition was made, also excludes the representatives of the Crommelin estate. It is said that the proceedings were contested by the proprietors between Fulton slip and Peck slip : whether by all or not, is uncertain. This cannot be held sufficient to waive the necessity of notice. It is not necessary, for the purposes of this suit, to decide to whom the wharfage on the other part of the pier belongs, whether to the owners of the first pier or others. If the corporation are not entitled to the wharfage, their lessee had no right to distrain for it.

I have not adverted to the fact that this pier was not even constructed in accordance with the notice ; that it was extended 90 feet, when the notice only provided for an extension of 72 feet. It may well be that the owners or persons having the right of sharing in the extension, may have been unwilling to pay their proportion for the extension of 72 feet, when they would have been glad to unite in building the pier 90 feet. To deprive them of their rights, it was necessary that a strict compliance should be had with the requisites of the statute ; and if not, their rights are not affected.

My conclusion is, that the defendant Guion, as lessee of the corporation, was only entitled to the wharfage on the extended pier to the same extent that they were entitled to on the original pier, viz., the wharfage on the southerly side, and the southerly half of the outer end. The distress was made for wharfage on the easterly side and for the outer end, and which had accrued from 30th of April to 17th of May. By the statute, the wharfage is to be distrained for in the same manner as on a distress for rent.

Although this action could not be maintained for an excess in the amount of rent, yet, if it is made for rent or wharfage of premises for which the defendant had no right to distrain, or for a longer period than was due, the distress is void. It is admitted that this distress was for wharfage which accrued on the easterly side and on the outer end, and for a period of

time which embraces the wharfage that accrued on that side, as well as on the end. This makes the distress void, and entitles the plaintiff to recover.

The judgment rendered at special term must therefore be affirmed.